Mr. Silver you may begin when ready. May it please the court. My name is Jack Silver. I represent the appellate California River Watch. I'd like to reserve five minutes of my time for rebuttal. This case will determine whether or not Rick remains the cradle-to-grave statute that has been protecting people in the environment for more than 40 years. If as discussed by the in Vacaville's wells came from Wicks, it is already a RCRA waste pursuant to section 6903-27. If Vacaville is transporting that waste in such a way that it may present an imminent and substantial endangerment to health, they're within the cradle-to-grave zone of liability that Congress intended. In themselves concedes that the waste at the hexavalent chromium from Wicks is a RCRA waste and that if it was in their wells, Wicks might be liable under RCRA. Well, if Wicks is liable as a generator under RCRA, then Vacaville is liable if as alleged by River Watch, the transportation of that hexavalent chromium may present an imminent and substantial endangerment to health of the people being exposed to that. That's the point. Mr. Stewart, how does that transportation come about? The chemical what, seeps into the groundwater? Is that what happens? No, transportation is by pipes. I know, but how does it get to the pipe? No, how does the chemical get into the pipe? Your theory is it's released by someone who was operating that Wicks site, right? Yes. And then what happens to it? It seeps underground into the groundwater. Is that the way it gets into the water? Correct. The DTSC study showed that the groundwater was highly contaminated in the area. Contaminated by the people who operated the Wicks site. Correct. Is that right? Right. So it seeps into the groundwater. And then so anybody who transports the groundwater is transporting the discarded chemical. Is that your theory? Correct. So everybody who uses the groundwater in that area becomes a transporter, is that right? The transporter is an affirmative act. It's not we're not talking about a passive act. We're talking an affirmative act. I know that. But if you draw water, groundwater, you know, up from the ground, by well or otherwise, that's an affirmative act, isn't it? Yes. So everybody who uses that groundwater becomes a transporter. Oh, OK. Is that your theory? Well, no. Yes and no. In order to be liable under RCRA, the transportation itself has to present an imminent substantial endangerment. So if somebody is transporting that for other reasons and it's not posing an imminent substantial endangerment, then no, there's no RCRA liability. RCRA is tracing a contaminant, a waste from cradle to grave. So it doesn't make any difference how that transportation occurs. It could occur by putting it into a truck. It could occur by putting it into a pipe. There's many pipeline cases that DOJ prosecutes regarding a waste that are being transported by pipes that are coming from contaminated sources around. But not all of those, what you just call pipeline cases, are transporters of the waste. You know, I mean, almost at the time of discard, it's not transporting the waste after the waste, you know, say, goes into, you know, goes into an aquifer and it's pumped up from the aquifer. And then at that point, you know, somebody transports it further. There are no cases with that kind of transportation, are there? You have a case like that? There are no cases in which a person who's transporting potable water is liable under RCRA. But there are numerous cases in which liability would rest with the generator of that waste. All right, now, are you alleging that along the wheel of the generator? No, I'm alleging that pursuant to the statute itself, which holds that transporters are also liable, generators and transporters are liable, if the transporter is, may present an imminent substantial endangerment. And it doesn't matter how many steps from the, you know, initial active pollution the transportation is. In other words, say, if it's transported into an aquifer and chemical is present in aquifer and anybody who pumps up water from the aquifer becomes a transporter, is that right? Technically, but it wouldn't necessarily raise to RCRA liability. The other thing is that if you're looking... But you don't have a case that extends RCRA liability to a transporter that many steps removed from the initial contamination, do you? Well, yes, there is. I mean, give me your best case on that. Well, OK. There's a case, it's a case in which Crystal Geyser, that's United States versus CG Roxanne LLC. It's 218 CR 00448. But basically, it's where Crystal Geyser is taking water from the aquifer that has arsenic in it. And then what they're doing is that they're removing the levels of arsenic down below the MCL. And then they're transporting the material that they're the water that now that they've taken the arsenic out and they're transporting that in a truck. So, no, it's not the same as a portable water person transporting it to their constituents. But the question is, is that if this is a cradle to grave analysis, if let's say that it was a solvent that was in the water that was put in there by a factory that caused birth defects and it wasn't one that the Safe Drinking Water Act had an MCL for. So how would you why wouldn't that be part of RCRA's cradle to grave analysis in order to prevent harm to either the environment or to health of those people drinking that water? So basically, are you saying RCRA doesn't have a mens rea element? Is that bottom line? It doesn't matter if you intended to do it or if you wanted to do it or even if you knew about it, if you did it and it causes harm, you're liable. Is that kind of your argument? Correct. Well, it's not the argument. It's the law. It's strict. It's the pliability. There is no it is whether you if you committed that act, that's it. So but the fact is, is that that Vacaville knows it's it's pumping hexavalent chromium into every home, business and school at levels that that at least Riverwatch alleges may you know, present an imminent and substantial endangerment. Why wouldn't the homeowner who takes a glass, fills it up with tap water and delivers delivers it to his son, why wouldn't they be liable under the same statute? As a transporter. If you want to extend the laws that far, I mean, if you're looking for whether or not this is going to explode into huge amounts of litigation, I think that the idea that there's no controversy that a pipe is a transporter. Yes, you could have a person drinking hexavalent chromium and then walking down the are they a transporter of that that there's always absurd extensions that you can make. But the practical reality here is that they are transporting hexavalent chromium, a discarded material, and that the court's decision had to do with whether or not the material was discarded or not. It was already discarded. Well, now, Mr. Silver, that wasn't your argument in the district court, was it? But what was an argument that, you know, the reason for the liability is because the city of Vacaville is transporting this chemical discarded by the people who operate the worksite. That wasn't your argument, was it? Not only was it our argument, it's in the complaint itself. And the district court, even for purposes of summary judgment, accepted the fact that the material was discarded material from Wicks and that that it was being there was no just no conflict that it was being transported. The judge's decision was based on the fact that it wasn't being discarded by by Vacaville. So, well, but that was your theory of liability, as you argued to the district court. The city was liable for either, you know, I forgot, you know, one of two theories, right? Either it was a discarder or, you know, it was a byproduct of the production of water. Right. I mean, that's what the district court opinion discusses, you know, quite exhaustively. Right. Right. So one of our theories was that this is what you argued in the district court. OK, one of our theories was that this this is material that's not wanted by the consumer. And therefore, if it's a byproduct of of the production of water and if it's not wanted by the consumer, it's a waste product. Yes, that was one of our theories. The other one was that is already a waste and it came from Wicks because there's no reason to discuss the other ones. If it's it was already assumed that it's come from Wicks is already a waste pursuant to six nine oh three twenty seven. So there was no reason to go further than making those allegations and showing that they were transporting. So that yes, that was one of our theories. And the other theory was that it's already a discarded waste and that Vacaville is transporting it. And and we're not you know, you can always find exceptions why something would not apply. But we're talking about a transportation that is both intentional and to a large population of over 100000 people of a solid waste. So if you're going to somehow exempt a potable water purveyors from this. And what I'm getting at is I think the city's point on appeal that this argument argument you're making now on appeal to hold the city to transporter is a theory that you didn't argue in district court. So you can't raise it on appeal. What's your response to that? Did argue in district court. In fact, the judge accepted for purposes of the summary judgment motion, our experts opinion that the that the waste was from Wicks, that it was a discarded waste, that it was a waste from Wicks. And there was no there was no ever an argument that that Vacaville was transporting that waste. So that was there was no argument about or disagreement, let's say. And in the findings of fact, if you look at the that the not the findings of fact, but that the River Watch's suggested findings of fact and conclusions of law, one of those is that Rick that they're a transporter of waste from Wicks. So that argument was made. It wasn't the central argument that was discussed before the court because it was already as far as the motion to dismiss was concerned and the conclusion of this case, that was already part of the the argument. Counsel, do you want to reserve some of your time for rebuttal? Five minutes I reserve. Sorry. You have about a minute and twenty seven, but I'll give you a little more time. Mr. Newmark. Thank you, Your Honor. May it please the court. Gregory Newmark for the city of Vacaville. There are essentially three categories of issues in this appeal. First, does an innocent regulated public drinking water utility become liable under a third party solid waste? Second, are there any admissible facts showing that's what happened in tobacco bills? Well, in this case and third, does rigorous anti duplication provision preclude River Watch's attempt to impose drinking water quality requirements that contradict EPA's regulatory, scientific and policy determinations under the Safe Drinking Water Act? River Watch's reply brief fails to engage with any of these issues. The city pointed out that River Watch cited no case where an innocent well owner was liable under RCRA for contamination caused by a third party. Counsel, where in RCRA does it have a mens rea element that you have to be guilty or not innocent? Your Honor, I imagine in the criminal enforcement provisions there are, but for the drink liability statute, as Mr. Silver identified, but that still requires a demonstration that there is a solid waste issue. And the definition of solid waste includes the concept that it must be discarded. But let me ask you this, the transporter has to be the discarder. I think that's true. The transporter of solid waste does not have to be it doesn't have to be discarded. But I do think that. Go ahead. So whether or not the city is innocent, it seems irrelevant under the statute. I guess I'm saying that there's no action by the city with regard to the handling or management of the solid waste at the WIC site, which is where there's acknowledged to be waste. The city recognizes that. But that's been River Watch's argument in this case. I do want to take a moment to focus on Judge Tashima's questioning of Mr. Silver about where River Watch was questioned. Did it or this is a different theory than what you argued at the district court. Did you argue that River Watch was a transporter? And we tried to explain our briefing. It's a complicated argument. Well, let me let me interrupt you and I apologize. But didn't the trial court find that that was a fact? In fact, didn't it say in its order that Vacaville was pumping its potable water from sources that are contaminated prior to the treatment? In other words, the WIC's dumps. Yes, to the first part of your statement, your honors, no to the second. With regard to the first part, is the well is the water that Vacaville pumps, does it contain hexavalent chromium before it gets to the well? Yes, it does. Is it from the WIC site? No, the district court did not find that. Um, well, I'm not saying the court didn't find that, but wasn't that an argument that the court considered when it made his decision that it came from potable water sources that are contaminated prior to the treatment? I think it considered that it considered River Watch's argument that the River Watch contended that the source of the contamination was irrelevant for their record claim because they wanted to establish liability for all the wells, not just the two that were affected allegedly by the WIC site. So the court didn't focus in on that. It did discuss River Watch's expert opinion and recited the provisions that River Watch has been relying upon in its briefing extensively as examples of speculative and the city's objection. But I think the point there is even if the groundwater is contaminated by waste at the WIC site, that does not transform the entire aquifer into solid waste itself. And so that... Well, but your argument was that this was a new issue that surprised you, apparently, on this appeal, that they're arguing WIC as the source of the contamination. And as I read the motion for summary judgment, WIC's facilities mentioned throughout River Watch's motion as a possible source for the hexavalent chromium. The pivot that they've shown a real willingness to evolve their case, Your Honor. And if I may point the court to the River Watch's excerpt to the record, page eight, which is the page where the district court was struggling to how to describe River Watch's claim. And it says, beginning of line 10, upon more focused briefing, however, and as clarified at the hearing, what River Watch actually claims is that Vacaville is generating a hazardous substance, namely hexavalent chromium, through its potable water pumping, treatment and distribution activities, and then carrying that substance through its distribution channels to its consumers in the form of potable water. So because they were swinging for the fences and trying to get at any hexavalent chromium in the drinking water system, irrespective of the source, which they said was irrelevant and immaterial over and over again, they actually claimed that it was not a transporter case. It was a generator case. And that is, you know, again, there's another comment from the district court about that concept on page eight. And so that's why the district court tried to grapple with this unique theory that River Watch has come up with to determine, OK, if River Watch is. Counselor, you're saying that River Watch never alleged that Vacaville was a transporter below? They alleged everything. In their complaint, Your Honor. But in this very difficult to comprehend theory, their byproduct theory that the district court grappled with, they claimed that Vacaville was essentially a generator. And by as best I can understand, by not removing the hexavalent chromium from the water before it was placed into the distribution system, that was the same as making Vacaville a generator. Well, I'm still hung up then on the court's finding that Vacaville is pumping as potable water from sources that are contaminated prior to any treatment. And by that statement, it has to be Wicks. Is there any other source? Oh, absolutely, Your Honor. Like the city identified copious amounts of scholar literature and an expert report that demonstrated that hexavalent chromium is a common and naturally occurring metal that comes from serpentinite, I believe is the geological formation where it's located everywhere. That was a focus of extensive expert discovery. And if you look back into our briefing, we identified that I think there were, I want to say, six or nine wells that had somewhat elevated levels of hexavalent chromium. Let me interrupt you, and I apologize, but didn't Dr. Russell testify that the sources of the hexavalent chromium in the well field was man-made and likely from Wicks? He offered a speculative opinion that... Did he testify to that? In the Elmira well field, yes, Your Honor, but those were basically only two of the elevated wells. The other wells were not in the Elmira road well field. And he still contended that the hexavalent chromium in those wells was discarded by the city into the distribution system there. But there was no argument that the Wicks system affected wells other than those in the Elmira well field. There were more wells outside the well field than there were in that were at issue in the case. Well, isn't that a question of fact? The source of the hexavalent chromium in a given well probably is a question of fact, which I think is why River Watch insisted that it was irrelevant. And that's why it could be determined, their case could be determined without determining. They said over and over again, it doesn't matter where it came from. Vacaville put the water into the distribution system. And so Vacaville is liable, according to River Watch, under River Watch. And the trial court rejected that argument, said it's a question of fact, and denied their motion for summary judgment, didn't it? No, I think that the trial court found that even if that were proven to be true, it wouldn't satisfy the requirements of being a solid waste as a matter of law under RFRA. There's no allegation that the city handled any solid waste. And it's as a matter of law, affected contaminated water by a waste site does not all become a waste. So if the entire aquifer were contaminated by the WIC site, then the entire aquifer does not then become solid waste subject to RFRA, which it gets a little bit too. Hopefully not. That's where I just don't get it. You know, there's nothing in the statute that requires the transporter to be the discarder. And so if the waste is discarded, which we, you know, under the facts alleged we can accept, and the city is transporting that water, why is it not a transporter of discarded waste? Your Honor, because the contaminated groundwater is just affected by the discarded waste, it is not the discarded waste itself. And also, that seems just like a semantical argument, isn't the hexachromium in the water? So under the allegations, the hexachromium is in the water. So therefore, the discarded waste is in the water. Well, RFRA and even the implementing statutes that are cited in the CARE case, and I think in the Covington case, which Riverwatch cited in its reply brief, show that there's a distinction between groundwater contamination at a RFRA managed facility is actually not barred within the waste boundary. They just can't have groundwater contamination caused by the waste outside the waste boundary. So there's this distinction between the waste itself and the contamination it allegedly causes. And if you look back at the remedial purpose of RFRA, which Mr. Silver talks about, was to require appropriate disposal of and management of hazardous and solid waste. So finding any downgradient well owner or in the Little Hocking case, anybody whose car has illegally discarded waste fall on it, finding them liable as a transporter does absolutely nothing to effectuate the remedial purpose that Congress had in mind in enacting RFRA. Why not? Couldn't the city clean the water before it transports it? It could, but that wouldn't do anything about the waste still coming from the WIC site. It wouldn't do anything about management of waste at the WIC site where the waste actually happened. At that point, at the WIC site, it's contained, but the city is the one that's spreading it. So why shouldn't the city be liable for cleaning it before it spreads it? Your Honor, the best that I can say is there has to be a distinction between the disposal and management of solid waste at the WIC site and innocent parties who did not intend to have anything to do with waste that are affected by it. Well, doesn't the RCRA require that the solid hazardous waste may present an imminent and substantial endangerment to health or to the environment? So doesn't that kind of rule out your argument about the water being sprayed on the car and that type of thing? Isn't it looking really at substantial endangerment to health or in the environment? Well, that is an essential element of a RCRA claim. And I think what RiverWatch has tried to do is bootstrap that into, you know, if they believe they can show an imminent and substantial endangerment from the levels of hexavalent chromium in the drinking water, then, well, that must mean it's actually discarded solid waste or that must mean it's a hazardous waste is what they initially argued and then had to back away from. So I would be the hypothetical used in our brief from the Little Hawking case, which was a different scenario. I think that if somebody had the waste on their car and we're transporting it around, that in and of itself probably wouldn't cause an imminent and substantial endangerment. But when they go to wash their car and wash that off into the gutter, that would be discarding that waste. It could and probably would cause an adverse effect in the environment because it would be getting into the Ohio River in the Little Hawking case where it was demonstrated to cause ecological harm. What's the limiting factor then you want us to find on whether or not, you know, the difference between the city and the person drinking water or a person washing their car? What's the limiting factor that you want us to add to the statute? The limiting factor, Your Honor, is there need the RIPRA was designed to compel those discarding, managing, generating hazardous waste to do so responsibly and to take care of it. But there has to be a distinction. I'm sorry, Your Honor, that just sounds like a mens rea element to me, which you said earlier. I get the limiting factor that we have is that there's a distinction between the generation of waste and contamination that it might cause. And so under River Watch's theory, the plaintiff in Little Hawking, the plaintiff in CARE, the plaintiff in probably in BNSF would be liable parties under RIPRA. Nobody's ever brought that out before because it's an absurd consequence. But that's what River Watch's theory is here, Your Honor. Well, well, doesn't the statute say that? I mean, the statute says if it's a generator or transporter or transporter of solid or hazardous waste, that there's liability. If it's the waste, Your Honor. So if I might, my waning seconds, if we were talking, there was a groundwater treatment and extraction system at the WIC site that's demonstrated in the record. So if the city were pumping, taking the water that was pumped out, highly contaminated hexavalent chromium water, it was part of the remedial efforts at the WIC site. And taking that and putting it in a truck, super highly contaminated water, and drove that somewhere and dumped it, that would be transportation of waste, right? That was the waste at the WIC site. But when we have migration of contamination from the WIC site that's affecting other people down Bradian, that's not the waste at the site. And I should say, like, the groundwater there becomes a waste when you take it out and try to get rid of it because there's an attempt to just guard the contaminated groundwater from the WIC site, whereas the city's not attempting to just guard its water. This is a product. This is their product that meets all health based requirements for it, meets every requirement of the Safe Drinking Water Act. It's not just guarding it at all. If it's allegedly been contaminated by WICs, then WICs would be liable, but not the city as the innocent party down Bradian. Well, then you're going to get back in the mens rea, plus WICs and the city could both be liable for that, couldn't they, under the statute? I don't believe so, your honor. I think if the contamination violated a Safe Drinking Water Act standard, then the city would have to comply with that in delivering its drinking water. So EPA establishes minimum standards for operating a public water supply system. It is true that irrespective of how contaminant gets into that well, the city can't deliver the water unless it meets those Drinking Water Act requirements. And so when there was a state law that required 10 micrograms per liter of hexavalent chromium in the safe drinking water system, the city was working on a plan to comply with that. But those are drinking water regulations. I don't care about drinking water. I'm talking about the RCRA, the case we're talking about here today. WICs and the city both could be responsible for that. But just because WICs could also have responsibility doesn't mean the city can't. True? I don't agree with that, your honor, because the city had nothing to do with the management of the waste. The waste is at the WIC site, stayed at the WIC site. And if there was contamination that migrated from the WIC site, that does not mean every bit of soil and water that was affected by the WIC site then becomes hazardous waste. That would make the entire San Fernando and San Gabriel Valleys. Anybody who pumps out water would be transporting waste. That's not how RIFRA is a hazardous waste. Let me interrupt you. So you're adding to the requirement that under RCRA, that a defendant has to be near the site where it happened, where the waste occurred and transport the solid waste? The waste has to come from the solid waste has to be discarded material. So I suppose at a disposal location, right, or a hazardous waste treatment facility. Let me interrupt you. How far away does the disposal have to be from where the water is collected by the city before it becomes the city's responsibility? I think if the city had a well. Your Honor, like the city would have to be managing waste from the WIC site, so it would be discarded material from WIC at the WIC site. So if WIC was 10 feet away in the water, it came right to the water, the city had no responsibility since it wasn't managing the WIC site. Is that what you're saying? The city would have no responsibility for it wasn't generating waste. It's just pumping water. And if that water meets regulatory requirements, it would pump it. If the city has to treat its water and remove contaminants from the water, which many cities do, they have to take that removed waste and manage it appropriately according to solid waste laws. So like in the Little Hocking case where the well owner had super granular activated carbon treatment vessels, when those vessels get too loaded with C8 and have to be discarded, that waste is discarded. It needs the city, the operator of those vessels, the generator, and needs to be managed appropriately. Any other questions? Okay, Mr. Newmark, your time is up. Mr. Stilwell, I'll give you some extra time since Mr. Newmark took a little more time, too. Thank you, Your Honor. First, if you remember, these are cross motions for summary judgment. And Riverwatch's argument that the waste was from WICs and was being transported by Vacaville, that constituted a violation of RCRA pursuant to the you know, to the plain language of the statute is within our arguments. Obviously, you know, there were more arguments that we made. Second, let's not miss the forest for the trees. The whole intent of RCRA is to track waste so they do not pose any type of harm to the environment or to health. And so that's why they have a laundry list of people. They have generators, they have transporters, they have the whole list under 6972A1B and A. The other thing is that the idea that, for instance, let's take that somebody has sprinklers and their sprinklers are near a creek and some of the water goes into the creek and they don't have an NPDES permit for those types of discharges. You don't see the courts filled out with cases like that, where somebody is discharging a pollutant to a water of the United States without a permit because their sprinklers are overrunning. So I think the courts have generally looked at these cases with regard to whether or not there is imminent and substantial endangerment. And so when you have somebody transporting by pipe to a population of more than 100,000 people, a substance that is known to cause birth defects and cancer, and as pursuant to or alleged by Riverwatch at levels that may present imminent substantial endangerment, that's a factual issue for the court to examine. And the issue that we're addressing with the court is that the court plainly states that generators and transporters must discard. Well, you know, it must have discarded material. We get that. But the fact is, is that if it's already discarded material, it doesn't have to be discarded again. And that's the whole crux of the appeal is very narrow to that one issue. And it's important that we understand that you can't transport a waste by any means such that may impose or may present an imminent and substantial endangerment to health of the environment. That's the intent of the statute. That's the plain language of the statute. And to try and get around that by making some sort of an exemption for a water purveyor creates a liability in which, again, let's say that you're dealing with a very poisonous substance, much more poisonous than hexavalent chromium, like a solvent that is known to cause birth defects. And yet you're not going to do anything about it because you're going to say that RCRA doesn't cover that kind of transportation. It just creates a problem, I think, that even DOJ would have several of the cases that they're doing. Thank you, counsel. This case will be submitted.
judges: Tashima, Bumatay, Rayes